**Document Filed Electronically**

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STRYKER SPINE, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 08-1827-CKK |
| v. | : | |
| | : | District Judge Colleen Kollar-Kotelly |
| BIEDERMANN MOTECH GMBH; and | : | |
| DEPUY SPINE, INC., | : | |
| | : | |
| Defendants. | : | |
| | x | |

**REPLY MEMORANDUM OF PLAINTIFF STRYKER SPINE
IN RESPONSE TO MEMORANDUM OF INTERVENOR
UNITED STATES IN SUPPORT OF CONSTITUTIONALITY OF
THE APPOINTMENT OF ADMINISTRATIVE PATENT JUDGE MOORE**

<u>**TABLE OF CONTENTS**</u>

Page

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION ................................................................................................1

II.     THE GOVERNMENT MAKES NO EFFORT TO DEFEND THE
        ORIGINAL CONSTITUTIONAL VIOLATION...............................................2

III.    APJ MOORE'S OSTENSIBLY LAWFUL STATUS WHEN HE
        DENIED REHEARING DOES NOT CURE THE VIOLATION .......................3

IV.     THE LEGAL FICTIONS CREATED BY P.L. 110-313 CANNOT
        ERASE INDISPUTABLE VIOLATIONS OF THE
        APPOINTMENTS CLAUSE................................................................................7

        A.      The Backdating Of APJ Moore's Appointment Was
                Ineffective To Render His Earlier Decisions Proper And
                Constitutional ............................................................................................8

                1.      *Swayne & Hoyt* ............................................................................8

                2.      *Heinszen* ....................................................................................10

                3.      *Quackenbush* .............................................................................11

                4.      *Plaut* ...........................................................................................11

        B.      Congress's Attempted Creation Of A *De Facto* Officer
                Defense Was Ineffective .........................................................................12

V.      THE APPOINTMENTS CLAUSE IS NOT "TECHNICAL" ...........................17

VI.     CONCLUSION..................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Andrade v. Regnery*,
    824 F.2d 1253 (D.C. Cir. 1987) ................................................................................6, 7

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ...........................................................................................................17

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) .........................................................................................7

*Gould v. Mossinghoff*,
    32 Fed. R. Serv. 2d 1384 (D.D.C. 1981) ........................................................................6

*Nat'l Trust for Historic Pres. v. Dept. of State*,
    834 F. Supp. 453 (D.D.C. 1993), *aff'd in part and rev'd in part*
    *on other grounds sub nom*,
    *Sheridan Kalorama Historical Ass'n v. Christopher*,
    49 F.3d 750 (D.C. Cir. 1995) .......................................................................................4, 5

*Nguyen v. United States*,
    539 U.S. 69 (2003) .........................................................................................................17

*Olympic Fed. Sav. & Loan Ass'n v. Director, Office of Thrift Supervision*,
    No. 90-482, 1990 WL 134841 (D.D.C. Sept. 6, 1990) ...................................................6

*Paramino Lumber Co. v. Marshall*,
    309 U.S. 370 (1940) .......................................................................................................12

*Plaut v. Spend Thrift Farm, Inc.*,
    514 U.S. 211 (1995) ..........................................................................................11, 12, 15

*Quakenbush v. United States*,
    177 U.S. 20 (1900) .........................................................................................................11

*\*Ryder v. United States*,
    515 U.S. 177 (1995) ..........................................................................................12, 13, 14

*Swayne & Hoyt, Ltd. v. United States*,
    300 U.S. 297 (1937) ...........................................................................................8, 9, 10

*United States v. Denedo*,
    ___ U.S. ___, 129 S. Ct. 2213 (2009) ...........................................................................14

*United States v. Heinszen & Co.*,
  206 U.S. 370 (1907)...................................................................................................10

*Williams v. Sec'y of the Navy*,
  787 F.2d 552 (Fed. Cir. 1986).................................................................................14

**Statutes, Rules & Other Authorities**

35 U.S.C. § 6(c) .......................................................................................................8, 14

35 U.S.C. § 6(d) .......................................................................................................8, 12

35 U.S.C. § 145 ............................................................................................................6

37 C.F.R. § 41.125(c)...................................................................................................4

37 C.F.R. § 41.52(a)(1) ................................................................................................4

Pub. L. No. 106-113......................................................................................................7

Pub. L. No. 110-313............................................................................................1, 3, 7

154 Cong. Rec. E1657-01, 2008 WL 2945176 (July 29, 2008) .......................................15

154 Cong. Rec. H7233-01, 2008 WL 2902350 (July 29, 2008)...................................2, 16

*Manual of Patent Examining Procedure* § 1214.03 .............................................................4

John F. Duffy, *Are Administrative Patent Judges Unconstitutional?*, 2007
  Patently-O Patent L.J. 21, 29 (2007).........................................................................18

## I.    <u>INTRODUCTION</u>

Plaintiff Stryker Spine (referred to in previous briefing and hereinafter as "Stryker/Carbone") respectfully submits this reply memorandum in order to respond to the memorandum filed by intervenor United States ("Government") regarding the constitutionality of the appointment of Administrative Patent Judge ("APJ") James T. Moore of the Board of Patent Appeals and Interferences ("Board").[1]

As Stryker/Carbone will demonstrate, the Government has all but conceded that the original appointment of APJ Moore by the Director of the Patent and Trademark Office ("PTO") violated the Appointments Clause of the Constitution art. II, § 2, cl. 2.  The Government also appears to concede that APJ Moore's participation in two substantive decisions of the Board (one of which he authored) was unlawful and unconstitutional at the time those decisions were rendered.

Instead, the Government only argues, first, that because APJ Moore was ostensibly properly reappointed at the time of the Board's third and last substantive decision, *i.e.*, its denial of Stryker/Carbone's motion for rehearing, Stryker/Carbone has received all of the constitutional rights to which it is entitled.  The Government's second and primary argument is that Congress had the right and authority to excuse its own prior violation of the Appointments Clause with a legislative fix enacted in 2008, *i.e.*, Public Law No. 110-313, which (according to the

---

[1] This issue was previously briefed by Stryker Spine and defendants Biedermann Motech GmbH *et al.* ("Biedermann") in Stryker/Carbone's motion for summary judgment (Dkt.35), Biedermann's opposition (Dkt.39), and Stryker/Carbone's reply (Dkt.46).  The issue has also been briefed in Biedermann memorandum in support of its own motion for summary judgment (Dkt.36 Part IX), Stryker/Carbone's opposition thereto (Dkt.37 Part VI), and Biedermann's reply (Dkt.49 Part II.D).

Government) effectively authorized the PTO and the Secretary of Commerce to erase all prior constitutional violations by executive fiat.

For the reasons which follow, the Government is mistaken.

## II.    THE GOVERNMENT MAKES NO EFFORT TO DEFEND THE ORIGINAL CONSTITUTIONAL VIOLATION

As Stryker/Carbone has previously explained, the original appointment of APJ Moore by the Director of the PTO in 2001 violated the Appointments Clause because the Director is obviously not the President; obviously not a "Head of Department" (unlike, *e.g.*, the Secretary of Commerce); and obviously not a "Court of Law." (*See* Dkt.35, at 8-10.) The Government has chosen to neither acknowledge this initial unconstitutional arrangement, nor disagree with Stryker/Carbone's contentions in that regard, stating only that "[c]oncerns were raised" about the arrangement that existed between 2000 and 2008. (Government Br. 2.)[2]

Nonetheless, the Government's brief is helpful in demonstrating the insufficiency of *Biedermann's* effort to establish that APJ Moore's initial appointment by the Director of the PTO was constitutional. The Court may recall that Biedermann argued that this was the case on the theory that the Board qualifies as a "Court of Law" (*see* Dkt.39 Part IV.D.1), or because the Director of the PTO qualifies as a "Head of Department" (*see id.* Part IV.D.2). The Government's brief makes clear in a single sentence that both of these arguments by Biedermann are baseless: "Here, however, the Board is part of an Executive Branch agency, not an Article III court, despite the adjudicative nature of the Board's functions." (Government Br. 11.) The Government thus appears to agree with Stryker/Carbone that the Board is not a "Court of Law,"

---

[2] Others have not been so reticent. *See, e.g.*, 154 Cong. Rec. H7233-01, 2008 WL 2902350, *4 (comments of Rep. King) (July 29, 2008) ("[A] straightforward reading of article II, section 2, which I strongly endorse, suggests the 1999 authority that Congress bestowed on the Patent and Trademark Office Director to appoint administrative law judges is unconstitutional, inconsistent with article II, section 2.").

as Stryker/Carbone previously demonstrated.  (*See* Dkt.46 Part II.C.1.)  And by recognizing that the Board is "part" of an agency of the Executive Branch (*viz.*, the Department of Commerce), the Government apparently agrees with Stryker/Carbone that the Director of the PTO is not a "Head of Department" within the meaning of the Appointments Clause.  (*See id.* Part II.C.2.)

Accordingly, there appears to be no real dispute that at the time APJ Moore joined in the Board's decision of January 22, 2008 (AR 202-16), and at the time APJ Moore authored the Board's decision of April 30, 2008 (AR 468-80), APJ Moore had not been constitutionally appointed, such that both of those decisions were null and void at least until the legislative fix was enacted.[3]

## III.  APJ MOORE'S OSTENSIBLY LAWFUL STATUS WHEN HE DENIED REHEARING DOES NOT CURE THE VIOLATION

The Government argues — as did Biedermann — that any constitutional defect in the original January 22, 2008 and April 30, 2008 decisions by the panel was "mooted" in the Board's August 27, 2008 decision on rehearing because APJ Moore had been reappointed by the Secretary of Commerce on August 12, 2008.[4]  (Government Br. 5-6.)  The Government argues that the Board "undoubtedly" considered Stryker/Carbone's motion for rehearing on the merits; claims that Stryker/Carbone's motion for rehearing was not subject to a narrow scope of review;

---

[3] The Government has also failed to endorse Biedermann's theory that Stryker/Carbone "waived" its constitutional challenge by failing to raise it earlier than its motion for rehearing before the Board.  (*See* Dkt.39, at 9-11; Dkt.46, at 4-6.)

[4] Stryker/Carbone had previously questioned, based solely on Biedermann's evidence, whether APJ Moore's reappointment occurred on August 1, 2008, before Pub. L. No. 110-313 became effective.  (*See* Dkt.46, at 12-13 n.5.)  The Government cites its Exhibit 2 for the proposition that the reappointment took place on August 12, 2008, albeit with no authentication or explanation.

and asserts that Stryker/Carbone "had the opportunity to vet all substantive issues that it had previously raised."[5]  (*Id.*)  None of these assertions is accurate.

The Board's own regulations belie these arguments.   As set forth in 37 C.F.R. § 41.125(c):

> (3) *Burden on rehearing*.  The burden of showing a decision should be modified lies with the party attacking the decision.  The request must specifically identify:
>
>> (i) All matters the party believes to have been misapprehended or overlooked,[[6]] and
>>
>> (ii) The place where the matter was previously addressed in a motion, opposition, or reply.

Moreover, the Board's "Standing Order" would have prohibited Stryker/Carbone from fully rearguing all of the evidence and issues.  That Standing Order categorizes a request for rehearing as a "miscellaneous motion" (AR 53 ¶ 125.2), meaning that Stryker/Carbone was limited in its motion for rehearing to ten pages (AR 43 ¶ 121.2).

The Board's narrow scope of review on rehearing is substantially the same as the standard applied by this and other district courts.   For example, in *National Trust for Historic Preservation v. Department of State*, 834 F. Supp. 453 (D.D.C. 1993), *aff'd in part and rev'd in part on other grounds sub nom*, *Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750 (D.C. Cir. 1995), this court explained:

---

[5] The Government actually states that Stryker/Carbone had the opportunity to vet all substantive issues it had previously raised "concerning the priority of invention" in the motion for rehearing. (Government Br. 5.)  In fact, neither the original motion nor the motion for rehearing addressed priority; both related to the Board's refusal to redefine the sole "count" of the interference.

[6] The language of § 41.125(c)(3)(i) also appears in 37 C.F.R. § 41.52(a)(1), dealing with *ex parte* appeals to the Board.   As to § 41.52(a)(1), the PTO's own *Manual of Patent Examining Procedure* states (in § 1214.03)  that: "Experience has shown that many requests for rehearing are nothing more than reargument of appellant's position on appeal.  In response, the rule was revised to limit requests to the points of law or fact which appellant feels were overlooked or misapprehended by the Board."

> A motion for reconsideration is discretionary and should not be granted unless the movant presents either newly discovered evidence or errors of law or fact which need correction. Reconsideration is not appropriate where a party is simply attempting to reargue factual or legal assertions contained in their original pleadings.

*Id.* at 455 (citation omitted).

Because of the Board's regulations establishing this narrow scope of review, when moving for rehearing, Stryker/Carbone could not and did not fully reassert all of the evidence and arguments it had asserted previously, precisely because Stryker/Carbone was prohibited from doing so by the Board's regulations.

Not only did the Board's regulations establish a narrowly circumscribed scope of review on rehearing; the Board (per APJ Moore) enforced those regulations against Stryker/Carbone. The Board flatly stated: "We therefore DISMISS Carbone's request for rehearing for failing to comply with the rules and the standing order." (AR 530:21-22.)

It is true that the Board went on to state that when it considered the request for rehearing on the merits, the Board found it to be unpersuasive. (AR 530:23-24.) But that comment was at most directed only at the arguments raised by Stryker/Carbone in its motion for rehearing — a motion which itself had to comply with the Board's regulations and thus asserted only matters which were believed to have been "misapprehended or overlooked" by the panel. Moreover, the Board's final "Conclusion" made clear that the motion for rehearing was denied based on the limited scope of review that was applied by the Board:

Conclusion

For the foregoing reasons, Carbone's arguments do not establish that the Board *misapprehended or overlooked* matters that were previously addressed in Carbone's Motion 1. Consequently, we find that Carbone has not met its burden of showing that the panel's decision for Motion 1 should be modified *pursuant to 37 CFR § 41.125(c)*.

(AR 535:21-26 (emphasis added).)

In full effect, the Government now asks this Court to conclude that in addressing Stryker/Carbone's motion for rehearing, the Board did not follow its own regulations. Should the Court reach that conclusion, the Court should also conclude that the Board's findings are not subject to normal deference under the Administrative Procedure Act. *See Gould v. Mossinghoff*, 32 Fed. R. Serv. 2d 1384 (D.D.C. 1981) (allowing plaintiff in action under 35 U.S.C. § 145 to allege that where decisions were not rendered in the regular course of PTO procedures, there should be no presumption of administrative correctness).

In support of its argument that the decision on rehearing "mooted" the constitutional defect in the panel's prior decision, the Government relies on *Olympic Federal Savings & Loan Association v. Director, Office of Thrift Supervision*, No. 90-482, 1990 WL 134841 (D.D.C. Sept. 6, 1990). In *Olympic*, the plaintiff alleged that two earlier Directors of the Office of Thrift Supervision ("OTS") (Messrs. Wall and Martoche) had not been constitutionally appointed. *Id.* at *3. One or both of those directors had apparently rejected a "capital plan" submitted by Olympic. Thereafter — and unlike the situation here, where the appointment of APJ Moore was simply backdated — the President appointed a new director of OTS (Mr. Ryan). It was undisputed that Mr. Ryan had "ratified" the acts of the prior directors (*id.*) — *i.e.*, again rejected the capital plan.

Here, on August 27, 2008, APJ Moore (presumably properly reappointed by the Secretary of Commerce) did not "ratify" the act of a predecessor. He applied a narrow scope of review to his own prior decision of April 30, 2008, which he had issued at a time when — the Government appears to concede — Mr. Moore had no constitutional authority to act at all.

The Government also cites *Andrade v. Regnery*, 824 F.2d 1253 (D.C. Cir. 1987), in support of its contention that APJ Moore's presumably lawful status on August 27, 2008, when

he issued the decision denying rehearing, mooted any defect in the original panel decision.  In *Andrade*, the harm that was allegedly suffered by the appellants was not deemed to occur until a reduction in force ("RIF") was formally ordered by a Deputy Administrator, whose appointment was held to be proper.  Although the RIF had been planned in detail for some time previously, the D.C. Circuit explained that:

> [T]he particularized injury that permitted appellants to have standing to raise their claim was the loss of their jobs, not the mere fact that the government initiated plans that could have resulted in their demotion or termination.  It is the actual implementation of the RIF which we have power to redress, and that action, it is clear came at the hands of a duly appointed official.

*Id.* at 1257 (citation omitted).  *See also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302-04 (D.C. Cir. 2006) (violation of constitutional rights held to be *per se* irreparable harm).

Here, in contrast, the injury that was suffered by Stryker/Carbone occurred at least as early as at the original January 22, 2008 and April 30, 2008 decisions, at which time APJ Moore was not a lawfully appointed member of the Board.  As Stryker/Carbone has demonstrated, the fact that Stryker/Carbone had the ability to pursue a narrowly circumscribed request for rehearing, at a time when (per the Government) APJ Moore had been properly appointed, was too little, too late.

## IV.    THE LEGAL FICTIONS CREATED BY P.L. 110-313 CANNOT ERASE INDISPUTABLE VIOLATIONS OF THE APPOINTMENTS CLAUSE

The remainder of the Government's brief invokes Pub. L. No. 110-313, the statute hastily enacted in 2008 in an effort to fix the constitutional problem created in 1999 by Pub. L. No. 106-113 wherein the authority to appoint APJs was moved from the Secretary of Commerce to the Director of the PTO.  This legislative fix created two separate but related legal fictions:

■    First, as codified in what is now 35 U.S.C. § 6(c), the Secretary of Commerce was given authority to "deem" an appointment of an APJ to have taken effect on the date on which the Director previously appointed that APJ.

■    Second, as codified in 35 U.S.C. § 6(d), where the appointment of an APJ who was originally appointed by the Director is challenged, a *de facto* officer defense may be asserted.

Neither of these acts of legislative fiction pass constitutional muster.

**A.    The Backdating Of APJ Moore's Appointment Was <u>Ineffective To Render His Earlier Decisions Proper And Constitutional</u>**

As we have seen, according to the Government, on August 12, 2008, the Secretary of Commerce reappointed all APJs who had been previously appointed by the Director between 2000 and 2008.   At the time of the "reappointment" on August 12, 2008, the Secretary of Commerce was Carlos M. Gutierrez.   Under the legislative fix embodied in 35 U.S.C. § 6(c), APJ Moore's appointment was backdated to November 5, 2001, when Mr. Gutierrez was not even Secretary of Commerce; that Cabinet position was then held by Donald L. Evans.

The Government cites four cases purportedly justifying this type of backdating.  None of these cases support the Government's position here; indeed, none of these cases even involved the Appointments Clause.

**1.    *<u>Swayne & Hoyt</u>***

The Government's first case is *Swayne & Hoyt, Ltd. v. United States*, 300 U.S. 297 (1937), which did not involve an Appointments Clause issue.  On the contrary, all of the actions at issue had been taken by the Secretary of Commerce.   In *Swayne & Hoyt*, the Secretary of Commerce had issued a series of orders regarding discriminatory shipping rates charged by the appellants.  An attempt had been made to transfer authority relating to such rates through an

Executive Order which abolished what had been the United States Shipping Board and transferred its functions to the Department of Commerce.  Various later acts of Congress had made reference to the functions of the Shipping Board as having been later vested in the Department of Commerce.  With regard to the efficacy of the Executive Order, the Supreme Court explained:

> It is unnecessary now to pass on the efficacy of the transfer by Executive Order, for we are of opinion that as Congress itself had the power to abolish the Shipping Board and to require its functions to be performed by the Secretary [of Commerce], it had the power to recognize and validate his performance of those functions even though their attempted transfer by Executive Order was ineffectual.

*Id.* at 301.  It was in this context that the Supreme Court then stated (as noted in the Government's brief at 6) that Congress may by enactment "not otherwise inappropriate" ratify acts which it might have authorized.

Perhaps more importantly, the Supreme Court noted in *Swayne & Hoyt*:

> Here the retroactive application of the curative act impairs no substantial right or equity of appellants; their rights to an administrative hearing and determination, and to a judicial review, have been as fully preserved as if the act had been adopted at the date of the initial Executive Order.

*Id.* at 302.

Here, Stryker/Carbone was at all times entitled to have its patent rights adjudicated within the PTO by a panel of no fewer than three APJs constitutionally appointed by the President, the Secretary of Commerce, or a court of law.  Instead, Stryker/Carbone's rights were "impaired" by virtue of APJ Moore having been appointed and having held office for more than six years in violation of the Appointments Clause.

As to whether the backdating of APJ Moore's appointment was "otherwise inappropriate," it came about through a procedure that amounted to nothing more than Congress passing a second law excusing itself from constitutional violations which Congress itself caused

to occur when it passed the earlier law authorizing the Director to appoint APJs beginning in 2000.

Simply stated, *Swayne & Hoyt* cannot and does not justify the legislatively authorized backdating of APJ Moore's appointment.

### 2. *Heinszen*

The Government's second case, *United States v. Heinszen & Co.*, 206 U.S. 370 (1907), also had nothing to do with the Appointments Clause. *Heinszen* was one of a series of cases involving import duties during and in the aftermath of the Spanish-American War. The issue in *Heinszen* was whether Congress could lawfully ratify, by legislation, import duties that had been imposed pursuant to Executive Order of the President, which were viewed as having been unlawful. It was undisputed that Congress could have authorized the import duties in question from the outset. Rather than viewing the issue as being of constitutional dimension, the Supreme Court viewed this case as turning on the relationship between a principal and an agent:

> [W]here an agent, without precedent authority, has exercised in the name of a principal a power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement.

*Id.* at 382. The Court went on to note as an "important consideration" that:

> [A]lthough the duties were illegally exacted the illegality was not the result of an inherent want of power in the United States to have authorized the imposition of the duties, but simply arose from the failure to delegate to the official the authority essential to give immediate validity to his conduct in enforcing the payment of the duties.

*Id.* at 385.

*Heinszen* bears no relationship to this case. For *Heinszen* to be relevant, one would have to posit that Congress could have — without violating the Appointments Clause — authorized the Director of the PTO to appoint APJs to the Board. But Congress never had such authority.

### 3.    *Quackenbush*

The Government's third case on this point is *Quakenbush v. United States*, 177 U.S. 20 (1900).   This case involved the compensation of a Navy commander whose status and compensation over a period of several decades was called into question by a series of events which included, *inter alia*, (i) Commander Quackenbush having been dismissed by the Navy following a court martial; (ii) his sentence having been commuted; (iii) his having received — *on the same day* — a letter from the President advising him that he was no longer an officer of the Navy *and* a letter from the Secretary of the Navy ordering him to return the letter of dismissal; and (iv) the Navy having ostensibly carried Quackenbush as a commander on its records which resulted in the Navy exceeding the number of commanders authorized by statute. Ultimately, Congress enacted "An Act for Relief of John N. Quackenbush, Late a Commander in the United States Navy," which clarified the status of Commander Quackenbush at the pertinent times.  The Supreme Court simply held that the foregoing statute would be enforced according to — but not beyond — its terms.

Like the Government's other cases, *Quackenbush* had nothing to do with the Appointments Clause; indeed, *Quackenbush* neither mentions nor involved any constitutional issue whatsoever.

### 4.    *Plaut*

The Government also cites *Plaut v. Spend Thrift Farm, Inc.*, 514 U.S. 211 (1995), where the Supreme Court held that a statute which would have reopened final judgments in certain civil actions was a violation of the Constitution's separation of powers.  The Government notes that in *Plaut*, the Supreme Court contrasted its holding with earlier cases which had upheld legislation which altered rights previously fixed by, *inter alia*, administrative agencies.  (*See* Government Br. 8 (citing *Plaut*, 514 U.S. at 232).)

11

The case involving administrative agencies which the Supreme Court cited in *Plaut* was *Paramino Lumber Co. v. Marshall*, 309 U.S. 370 (1940). *Paramino* involved a *private* law passed by Congress relating to an administrative proceeding which had awarded the appellee, a longshoreman, compensation for injuries he had suffered. The private law at issue in *Paramino* did not alter the award; it simply directed the agency to review the case anew and issue a new order. The Supreme Court found no violation of due process, noting that: "This private act does not set aside a judgment, create a new right of action or direct the entry of an award." *Id.* at 378. While the underlying award in *Paramino* did issue out an administrative agency, that was not the Court's stated basis for its decision. In all events, neither *Plaut* nor *Paramino* involved the Appointments Clause.

*          *          *

In short, none of the Government's cases had anything whatsoever to do with the Appointments Clause. To be sure, none of these cases provide any support for the Government's argument that Congress could, by legislation, erase a clear (and apparently undisputed, at least by the Government) violation of the Appointments Clause by the simple expedient of backdating the appointment of an APJ to create the illusion that he had been appointed by one Secretary of Commerce by virtue of a piece of paper signed by another Secretary of Commerce some seven years later.

**B.    Congress's Attempted Creation Of A
    _De Facto_ Officer Defense Was Ineffective**

In connection with the purported *de facto* officer defense now embodied in 35 U.S.C. § 6(d), the Government cites *Ryder v. United States*, 515 U.S. 177, 180 (1995), for its statement that the doctrine confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or

election to office is deficient.  (Government Br. 9-10.)  To be sure, that hardly tells the entire story, omitting, as it does, the fact that the Supreme Court *rejected* a *de facto* officer defense in the case before it.

As Stryker/Carbone has previously discussed (Dkt.35, at 14-15), in *Ryder*, the petitioner challenged the composition of a court panel on a rehearing before the Coast Guard Court of Military Review, which rejected his challenge.  *Id.* at 179.  On review, the United States Court of Military Appeals acknowledged the existence of a constitutional violation under the Appointments Clause, but denied the appellant relief, holding that the acts of the unconstitutionally appointed judges were valid *de facto*.  *Id*.  The Supreme Court reversed, holding that such acts were not valid *de facto*, and that the petitioner was entitled to a hearing before a properly appointed court panel.  *Id*. at 179, 188.

The Court in *Ryder* undertook a thorough review of the *de facto* officer doctrine in dispute.  *Id*. at 180-84.  In rejecting a *de facto* officer defense, the Court distinguished the case before it, involving a violation of the executive power of appointment, from earlier cases involving, *e.g.*, "misapplication of a statute providing for the assignment of already appointed judges to serve in other districts."  *Id*. at 182.  Here, as in *Ryder*, what is at issue is a similar violation of the executive power of appointment, as carefully limited by the Appointments Clause, which was violated by APJ Moore having been appointed by the Director of the PTO.

The Government notes Stryker/Carbone's previous argument, based upon *Ryder*, that the *de facto* officer doctrine should not apply to cases still on direct review as this would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments.  (Government Br. 10 (citing Dkt.35, at 13 (quoting *Ryder*, 515 U.S. at 182-83)).)  The Government does not take issue with the statement made by the Supreme Court in *Ryder*,

nor could it.  Instead, it suggests that this Court not reach the *de facto* officer defense as it involves a constitutionality issue which need not be ruled upon unless unavoidable; and — per the Government — it *is* avoidable if this Court accepts the backdating of APJ Moore's appointment in accordance with 35 U.S.C. § 6(c).  (Government Br. 10.)

But as Stryker/Carbone has demonstrated, *both* of the Government's defenses under §§ 6(c) and (d) raise and require this Court to address what is — in essence — a single overriding constitutional issue: may the Congress pass a second statute allowing an officer of the Executive Branch to excuse an earlier violation of the Appointments Clause?  Stryker/Carbone submits that whether the issue involves § 6(c) of § 6(d), the answer is the same: Congress cannot constitutionally do so.

The Government attempts to distinguish *Ryder* on the basis that *Ryder* involved "appointees acting as Article III judges in a criminal case" (Government Br. 10) and implicated the Supreme Court's role as "guardian of Article III authority . . . ."  (*Id.* at 11.)  In fact, the court at issue in *Ryder*, in which judges had been appointed in violation of the Appointments Clause (namely, the Coast Guard Court of Military Review, later "rechristened" as a Court of Criminal Appeals, *see Ryder*, 515 U.S. at 179 n.1) was not an Article III court, but in fact an *Article I* court.  *See, e.g., United States v. Denedo*, ___ U.S. ___, 129 S. Ct. 2213, 2218 (2009); *Williams v. Sec'y of the Navy*, 787 F.2d 552, 561 (Fed. Cir. 1986).  Accordingly, this purported distinction by the Government is unfounded.

The Government also attempts to distinguish *Ryder* on the basis that, supposedly, "the President, the Congress, and the Secretary of Commerce have all expressed their strong desire that the decisions of Director-appointed APJs not be overturned on the basis of the manner in which these APJs were appointed."  (Government Br. 11.)  The Government cites no evidence of

such purported "strong desire"; nor does the Government cite any authority for the proposition that a constitutional issue is subject to the intensity of desires of elected and appointed officials.

What the Government may really be suggesting is that a broad holding by this Court on this issue could raise concerns about numerous issued patents and abandoned patent applications. The Government may be concerned, for example, that there are patents currently in force which have issued as a result of favorable rulings by the Board on patentability, and such patents might be subsequently attacked because one or more members of the Board who issued the favorable decision had been unlawfully appointed. The Government may also be concerned, for example, that inventors may have abandoned patent applications as a result of negative decisions on patentability by the Board, and such inventors might seek to revive such applications. *See* 154 Cong. Rec. E1657-01, 2008 WL 2945176 (comments of Rep. Jackson-Lee) (July 29, 2008) ("If courts hold these appointments unconstitutional, the effects could be widespread, affecting potentially thousands of patents and patent applications.").

If these are the Government's real concerns, the Court need not dwell on them. As noted above, Stryker/Carbone has focused its arguments on cases — like this one — in which decisions by the Board are still on direct judicial review, and Appointments Clause objections have been timely raised. Stryker/Carbone has no specific information on how many such cases exist, but believes the number is miniscule.

The Government makes much of the Court's statement in *Plaut* that when a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted and must alter the outcome accordingly. (Government Br. 8 (citing *Plaut*, 514 U.S. at 226).) In the context of the present case, the Government's reliance on this proposition would seem to suggest an improbable

outcome whereby the *de facto* officer defense must be sustained in cases like this one, which are still on review, but would be ineffective in the myriad of possible cases where rulings of the Board are no longer appealable, such as cases involving patents which have already issued and patent applications which have gone abandoned.

The Government's final argument is that since Stryker/Carbone has not challenged APJ Moore's having met the qualifications to serve as an APJ, "there is no reason to expect that he or any other APJ appointed by the Commerce Secretary would have reached a different result." (Government Br. 12.)  This is why Stryker/Carbone has previously urged that:

> The wisest and fairest course of action would be to direct the PTO to reassign this case to a completely new panel of APJs, who can approach this case afresh with no temptation to justify the Office's prior actions by proving that the legal status of the APJs is immaterial to the ultimate outcome.

(Dkt.35, at 17.)  Indeed, Congress itself contemplated that the *de facto* officer defense might not stand up and recognized that a remand to the PTO might be needed.  *See* 154 Cong. Rec. H7233-01, 2008 WL 2902350, *3 (comments of Rep. Cohen) (July 29, 2008) ("But should these judgeships be found to be unconstitutional and not de facto officers, the courts should remand the affected cases back to the U.S. PTO panels so that they may [be] dealt with expeditiously."

The Government appears to believe that a new panel will simply reissue the Board's previous decisions.  (Government Br. 12.)  It would be refreshing if the Government had more confidence in its own employees.  Stryker/Carbone believes the Board erred in addressing the merits of this case, as set forth in Stryker/Carbone's three summary judgment motions on which the Government has not commented (*see* Dkts.31-33), and would hope that a new panel might agree.  While Stryker/Carbone obviously cannot predict how a new panel of APJs would rule, Stryker/Carbone believes that a new panel might at least view the issues anew, and hopes that this Court would share that expectation.

16

## V.    THE APPOINTMENTS CLAUSE IS NOT "TECHNICAL"

The Government argues that applying the *de facto* officer doctrine is "particularly apt" here where the appointment defect is "technical rather than substantive" (Government Br. 11 (citing *Nguyen v. United States*, 539 U.S. 69, 77 (2003).)  In *Nguyen*, the Supreme Court gave examples of such "merely technical" defects as including one earlier case in which there was an irregularity in a circuit judge's designation of a district judge for temporary service in another district, or another case in which a judge was assigned to replace a deceased judge even though he had been designated to replace a disabled judge.  *See Nguyen*, 539 U.S. at 77-78.  In such cases, there was no suggestion that the designated judge had not been lawfully and properly appointed to the bench, even though there was a "technical" problem with a particular assignment.

Here, we are not debating whether APJ Moore was properly designated to decide one interference instead of another interference or perhaps an *ex parte* appeal.  His entire appointment was improper.  The comment from *Nguyen* cited by the Government cannot and does not negate the statement by the Supreme Court in *Buckley v. Valeo*, 424 U.S. 1, 125 (1976), that the Appointments Clause must not be read "as merely dealing with etiquette or protocol."

Whether Appointments Clause challenges are ever properly described as "technical," *this* case provides a good illustration of why *this* Appointments Clause problem raises important policy concerns, as noted by the law professor who first identified the problem of APJs being appointed by the Director:

> The overarching intent of the [1999] statute is to confer on the PTO head more authority and status, and yet keep the Office firmly within the Department of Commerce.  That schizophrenic intent goes to the very heart of the constitutional problem.  The Appointments Clause is designed to prevent the diffusion of appointment power precisely so that the individual with primary responsibility for a governmental department is both at a high level (subordinate only to the President) and readily identifiable.  This wise requirement makes the lines of responsibility more visible.  If

17

something is amiss in a department of government, responsibility — and blame — cannot be deflected to a lower level of government than the department head because he, or President himself, is directly responsible not only for managing the department but also for appointing officials who exercise any significant authority within it.  Yet the precise effect of 1999 statute is to push responsibility to someone below the department head and generally to muddle the lines of authority.  Who is to blame if the BPAI is producing unwise decisions?  The Secretary of Commerce can disclaim responsibility because, after all, he does not have power to select individuals to serve on the Board.

The ultimate reason this constitutional problem arose is therefore an innate conflict between a traditional reluctance to change lines of governmental authority and a growing recognition by Congress of the increased importance of intellectual property to the national economy.  The latter point counsels toward increasing the power, prestige and statute of the PTO head, but tradition pushes against creating a separate governmental department, like the Environmental Protection Agency, that is subordinate only to the President.  And so Congress took half a step in 1999, *but it is precisely such half steps that generate constitutional difficulty.*

John F. Duffy, *Are Administrative Patent Judges Unconstitutional?*, 2007 Patently-O Patent

L.J. 21, 29 (2007) (emphasis added).

## VI.    <u>CONCLUSION</u>

For the reasons set forth herein, and the reasons set forth in Stryker/Carbone's previous

filings on this issue, the Court should grant Stryker/Carbone's motion for summary judgment on

the Appointments Clause issue.

Respectfully submitted,

By:/s/ T. Vann Pearce, Jr.
    Steven J. Routh (D.C. Bar # 376068)
    T. Vann Pearce, Jr. (D.C. Bar # 978216)
    **Orrick, Herrington & Sutcliffe LLP**
    1152 15th Street N.W.
    Washington, D.C. 20005-1706
    Tel: 202.339.8509
    Fax: 202.339.8500

OF COUNSEL:

Arnold H. Krumholz
Roy H. Wepner
Keith E. Gilman
Kevin M. Kocun
Natalie S. Morelli
**Lerner, David, Littenberg,**
  **Krumholz & Mentlik, LLP**
600 South Avenue West
Westfield, NJ 07090
Tel:    908.654.5000
Fax:   908.654.7866

Dated: September 29, 2009         *Attorneys for Plaintiff Stryker Spine*

## CERTIFICATE OF SERVICE

I hereby certify that, on September 29, 2009 a copy of the foregoing REPLY MEMORANDUM OF PLAINTIFF STRYKER SPINE IN RESPONSE TO MEMORANDUM OF INTERVENOR UNITED STATES IN SUPPORT OF CONSTITUTIONALITY OF THE APPOINTMENT OF ADMINISTRATIVE PATENT JUDGE MOORE was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ T. Vann Pearce, Jr.
T. Vann Pearce, Jr. (D.C. Bar # 978216)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005-1706
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
vpearce@orrick.com